# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### October 30, 2014 Session

## SUSAN ELLEN CALFEE MUHONEN v. JAMES LUCIUS MUHONEN[1]

**Appeal from the Circuit Court for Bradley County**
**No. V-05-409      Lawrence Howard Puckett, Judge**

---

### No. E2013-02601-COA-R3-CV-FILED-FEBRUARY 20, 2015

---

This post-divorce parenting dispute arose when the father filed a petition to modify the parties' permanent parenting plan as to their two minor children.  Concomitantly with entry of the final judgment for divorce, the trial court had entered a permanent parenting plan order on January 19, 2007, designating the mother as the primary residential parent and granting the father residential co-parenting time on alternating weekends and Wednesday evenings. This parenting plan was later modified by agreement in an order entered June 17, 2008. Nearly five years later on July 27, 2012, the father filed the instant petition to modify the permanent parenting plan.  He alleged that a dangerous situation existed at the mother's home and requested an emergency *ex parte* order naming him the primary residential parent, which the trial court immediately granted.  Upon a hearing, the trial court entered an order, *inter alia*, confirming the father as the primary residential parent, pending further proceedings, on August 13, 2012.  Following a final hearing conducted approximately one year later, the trial court found that a material change in circumstance had occurred since entry of the June 2008 permanent parenting plan and that it was in the children's best interest for the father to be declared their primary residential parent with sole decision-making authority.  The mother has appealed.  Discerning no reversible error, we affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded

THOMAS R. FRIERSON, II, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J., and D. MICHAEL SWINEY, J., joined.

---

[1]The father's middle name was spelled, "Lucious," in several pleadings contained in the record. The father clarified in his answer to the original complaint for divorce that his middle name is spelled, "Lucius," and the correct spelling was used on the final judgment from which this appeal is taken.

Judith A. DePrisco, Knoxville, Tennessee, for the appellant, Susan Ellen Calfee Muhonen.

Philip M. Jacobs, Cleveland, Tennessee, for the appellee, James Lucius Muhonen.

## OPINION

### I. Factual and Procedural Background

The petitioner, James Lucius Muhonen ("Father"), and the respondent, Susan Ellen Calfee Muhonen ("Mother"), were married nine years prior to the entry of a final judgment of divorce on January 19, 2007. During the marriage were born two children ("the Children"), a son who was six years old and a daughter who was two years old at the time of the divorce judgment. Through the parties' permanent parenting plan entered with the divorce decree, the trial court designated Mother as the Children's primary residential parent. The court granted Father co-parenting time with the Children on alternate weekends and for two hours on Wednesday evenings, as well as fourteen additional days during the summer season. The court stated in the Judgment for Divorce that "[a]t the expiration of three months the court will review the visitation schedule to determine whether or not to implement Wednesday overnight visitation." The parties were granted joint decision-making responsibility as to the Children.

Father subsequently filed a petition to modify the original permanent parenting plan, and following a hearing, the trial court entered an agreed order adopting a modified parenting plan on June 17, 2008. While maintaining Mother as the primary residential parent, the agreed parenting plan increased Father's co-parenting time from 104 to 132 days per year, primarily by increasing his two-hour co-parenting time on Wednesday evenings to overnight co-parenting on Wednesdays.

One month later on July 17, 2008, Father filed a second petition to modify the permanent parenting plan, averring that a material change in circumstance had occurred because Mother had become pregnant, remarried, and relocated to Farragut, Tennessee, sixty-six miles away from her previous home. Father's petition further alleged that Mother's relocation was "a direct attempt to alienate the Father from the children" and that it disrupted the Children's lives. Father requested that the trial court name him the primary residential parent or, in the alternative, restrain Mother from relocating. Mother subsequently filed a motion to dismiss the petition. Following a hearing conducted on August 25, 2008, the trial court denied Mother's motion to dismiss Father's petition and ordered the parties to participate in mediation, pursuant to a provision of their permanent parenting plan. The court entered this order on October 17, 2008. No further action was taken regarding Father's July 2008 petition.

Nearly five years passed before Father initiated the instant action on July 27, 2012, by filing a new petition to modify the permanent parenting plan and requesting an *ex parte* order naming him the primary residential parent. In his petition, Father alleged that a dangerous situation existed at Mother's residence that had resulted in Mother's arrest for aggravated domestic violence against her paramour, G.G., on July 23, 2012. The trial court immediately granted Father the requested *ex parte* order, temporarily naming him the primary residential parent pending further hearing. At the conclusion of hearings conducted on August 13, 2012, and August 15, 2012, the trial court entered an order, *inter alia*, confirming Father as the primary residential parent pending further hearing, granting Mother residential co-parenting time on alternate weekends, and requiring Mother to submit to psychological counseling and drug and alcohol assessment prior to a final hearing. This order was entered on September 21, 2012.

During the years between entry of the June 2008 permanent parenting plan and the instant action, Father had remarried. His second wife, Kristi Muhonen, testified at trial on his behalf. Mother and her second husband, Eric Elliott, had divorced in 2010. Mother's marriage to Mr. Elliott produced a son who was three years old and residing with Mother at the time of the July 23, 2012 incident resulting in her arrest.[2] At the time of these proceedings, Father had been employed as an investigator with the Tennessee Bureau of Investigation ("TBI") for several years. Likewise, Mother had been a teacher in the Bradley County School system for several years. Following Mother's arrest on July 23, 2012, however, she was suspended from her position pending an investigation, and her employment was ultimately terminated by the school board. At the time of the final judgment in this action, Mother was appealing her employment termination.

During the August 2012 proceedings, Corporal David Harper with the Bradley County Sheriff's Department testified that on July 23, 2012, he was approached in a parking lot by G.G. at approximately 8:00 p.m. G.G. reported that he had been assaulted, showing Corporal Harper scratches and minor welts on his chest, shoulders, and back, as well as bite marks on his arm. After determining that the location of the alleged assault would be within the

---

[2]In its final judgment deciding the instant action, the trial court included the following footnote describing a separate proceeding involving Mother's child with Mr. Elliott:

> The factors that apply to these custody and visitation issues did not apply in the case involving Mother's child by Mr. Elliott. In *Elliott*, this court, exercised its appellate jurisdiction and heard the dependency and neglect case. This court found that the three (3) year-old was not a dependent and neglected child within the definition set out in Tenn. Code Ann. § 37-1-102(12)(A) through (J). Once this court found that the child was not dependent and neglected, the Chancery Court of Knox County, not this court, had jurisdiction over custody issues regarding the Elliott child.

Cleveland City Police Department's jurisdiction, Corporal Harper requested that a city police officer be dispatched to investigate. Corporal Harper opined that G.G. was coherent and did not appear to be intoxicated.

Cleveland City Police Department Officer Julius Porter testified that he responded to the request for an investigation into G.G.'s allegations and accordingly followed G.G. from the parking lot where he had approached Corporal Harper to Mother's residence. At the residence, Officer Porter interviewed Mother, who denied that an assault had taken place. He also spoke with Mother's three-year-old child, who nodded in response to questions regarding whether Mother had "hit" G.G. and whether Mother had told the child to bite G.G. Officer Porter stated that he found an aluminum baseball bat lying on the floor five or ten feet inside Mother's bedroom doorway. When he questioned Mother regarding a wooden paddle G.G. had described, Mother produced it from the same drawer where G.G. had said it was located. Officer Porter testified that based on the totality of the circumstances, he believed Mother to be the primary aggressor and arrested her on a charge of aggravated domestic violence. He opined that neither Mother nor G.G. appeared intoxicated and that he would have arrested G.G. for driving under the influence of a controlled substance if he had believed G.G. to be intoxicated.

Mother at all times denied having assaulted G.G. Mother testified that she had been involved with G.G. for two to three months prior to the July 2012 incident. She stated that although she had known G.G. was in the process of a divorce, she had not attempted to end their relationship until she learned from G.G.'s estranged wife that he had violated a Georgia restraining order and was charged with stalking his estranged wife. According to Mother, G.G. came to her home to paint a room on July 23, 2012. They drove together to Chattanooga to purchase paint, lunch, "skinny wine," and "skinny margaritas." According to Mother, once she and G.G. returned to her home, she drank only one glass of wine and stayed primarily downstairs with her three-year-old son. She acknowledged pouring herself a second glass of wine, but she stated that the glass was "knocked off" and spilled while nearly full. Mother described G.G. as seemingly unable to stand without falling after he consumed alcohol that day. Mother explained that she attempted to clean G.G. in the shower because he had rolled paint on himself. After G.G. came out of the shower, he saw that she had sent text messages to someone, and he became angry. Mother stated that she first asked G.G. to leave at approximately 5:00 p.m., and he eventually left two hours later.

G.G. testified that following the July 23, 2012 incident, he had recanted his victim statement and requested that the district attorney's office dismiss the domestic assault charge against Mother. He stated that he no longer believed Mother assaulted him. G.G. further testified that although he did not "really drink," he did drink alcohol Mother provided him that night to the point that he became too intoxicated to remember what occurred. He

maintained that his bite marks were the result of the three-year-old child's becoming excited during a tickling game and biting him. G.G. acknowledged that he was in the process of obtaining a divorce and that he was facing charges in Georgia related to violation of a restraining order obtained by his estranged wife. He also acknowledged that he had been terminated from his last two employment positions as a registered nurse. He further testified that he and Mother had engaged in sexual relations on Sunday, July 29, 2012, after the alleged assault and that he was relying partially on Mother to help him remember what occurred on July 23, 2012.

On October 3, 2012, the trial court *sua sponte* issued a notice, pursuant to Tennessee Supreme Court Rule 10B, advising the parties that no conflict of interest existed on the judge's part. Mother subsequently filed a motion for recusal on October 30, 2012, which the trial court denied by order entered the next day. On December 23, 2012, Mother filed a motion to dismiss Father's petition, requesting return of the Children to her primary residential care. Mother averred that the criminal charges against her arising from the July 23, 2012 incident had been dismissed, that G.G. had been charged with filing a false police report, and that she had completed an alcohol and drug assessment and a hair follicle drug screen with negative results. She also maintained the falsity of Father's claims in his petition regarding her behavior, particularly that she slept during the day while the Children were with her and exhibited a pattern of abusive behavior.

The trial court conducted a final hearing over the course of two days: July 19, 2013, and August 6, 2013. In addition to the parties, several witnesses testified on each party's behalf respectively. Father presented Justin Miller, a booking officer with the Bradley County Sheriff's Department, who reviewed Mother's "Inmate Intake Form" from the night of July 23, 2012, and confirmed that he had written an observation on the form that Mother was "[i]ntoxicated at the time of booking and crying." Officer Miller acknowledged that Mother had not been charged with any alcohol-related offense.

Father also called as a witness a former paramour of Mother's, J.S.M., who testified that he had been romantically involved with Mother for six to eight months, culminating in the spring of 2011. The parties' son practiced with a basketball team and a baseball team coached by J.S.M. during the 2010-2011 season. The parties' son also played on a different basketball team coached by Father. J.S.M testified that Mother "pulled" the parties' son from practice with his team when she ended their romantic relationship. J.S.M. further testified that Mother drank wine while she was taking prescription medication during the months that he knew her and while the Children were present in her home. He reported Mother's taking "three to maybe five pills" "on a daily/weekly basis," but Ambien was the only specific medication he remembered. He did recall that one of Mother's medications was an anti-seizure drug. According to J.S.M., Mother would "pass out" approximately twice a week

from the combination of medication and alcohol. When questioned regarding what he meant by "pass out," J.S.M. explained that "it would be harder to wake her up than a normal person." J.S.M. acknowledged that he was hurt when Mother ended their relationship, but he denied harboring any ill will toward her.

Father's current wife, Kristi Muhonen, testified that Father and she were married in August 2011. In addition to the Children, Ms. Muhonen's two sons from previous relationships, who were twelve years old and six years old respectively at the time of trial, resided primarily with them as well. She described their marital relationship as close and stable, and she believed her relationship with the Children to be positive and nurturing. Ms. Muhonen described instances in which she had overheard Mother "screaming" at Father when the Children were present, and Ms. Muhonen described one recent incident when she believed Mother had been urging the parties' son by telephone to testify on her behalf. Other witnesses who testified regarding a positive environment in Father's home for the Children included a pastor who led the Children's church youth groups and Ms. Muhonen's sister.

Regarding her alleged mixture of prescribed medication and alcohol, Mother testified that if she "were to drink a glass of wine, it would be at dinnertime and then, you know, and then take an Ambien later on." She acknowledged that after participating in counseling, she later learned that taking Ambien after drinking wine "wasn't the best of choices." Mother indicated that by the time of trial, she was taking only two medications regularly: one prescribed to control seizures and one prescribed to control high blood pressure.

Mother presented witnesses, including her aunt, her sister, and a former student's mother, who testified generally that Mother's relationship with the Children was loving and nurturing and that Mother had always provided for the Children's needs. The former student's mother testified that she had witnessed Father's being "hard on" the parties' daughter when he coached the daughter's basketball team. Mother's aunt stated that she believed Father to be an "abuser," and Mother's sister stated that she had observed Father to have a "bad temper."

At the close of trial, the court found that a material change in circumstance had occurred since entry of the June 2008 parenting plan and that it was in the Children's best interest for Father to be declared their primary residential parent. In an order entered September 17, 2013, the trial court, *inter alia*, denied Mother's motion to dismiss the petition, designated Father as the primary residential parent, and adopted Father's proposed permanent parenting plan, including his designation as the parent with sole decision-making authority for the Children. The court further ordered Mother to (1) obtain meaningful

counseling and treatment, (2) cease all name-calling of and false allegations against Father, (3) refrain from contacting Father's employer, and (4) cease and desist all contact with G.G.

Mother subsequently filed a motion to alter or amend the judgment, and Father filed a motion requesting an award of attorney's fees and discretionary costs. In an order entered October 31, 2013, the trial court denied all relief requested by Mother regarding the permanent parenting plan except to note that the parties had stipulated that they would attempt to align holiday co-parenting time to facilitate Mother's spending designated holidays with the Children at issue and her youngest child together. The court specifically found that the Children would "not benefit from joint decision making" and ordered that Father would "remain the decision maker on behalf of the children." The Court awarded Father attorney's fees in the amount of $12,709.69 and discretionary costs in the amount of $1,777.50. The trial court also entered an amended permanent parenting plan providing Father with 245 days and Mother with 120 days of annual residential co-parenting time. The day-to-day schedule in this permanent parenting plan is essentially an inversion of the June 2008 plan, with Mother caring for the Children on alternate weekends and all Thursday evenings. Mother timely appealed.

## II. Issues Presented

Mother presents two issues on appeal, which we restate as follows:

1.   Whether the trial court erred by finding, by a preponderance of the evidence, that Mother's pattern of behavior constituted a material change in circumstance since entry of the parties' previous permanent parenting plan.

2.   Whether the trial court erred by finding that it was in the Children's best interest to modify the permanent parenting plan and designate Father as the primary residential parent with sole decision-making authority.

## III. Standard of Review

We review a non-jury case *de novo* upon the record, with a presumption of correctness as to the findings of fact unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000). We review questions of law *de novo* with no presumption of correctness. *Bowden*, 27 S.W.3d at 916 (citing *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 924 (Tenn. 1998)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

IV.  Material Change in Circumstance

Mother contends that the trial court erred by finding that her behavior constituted a material change in circumstance since entry of the June 2008 permanent parenting plan.  She argues specifically that the trial court erred by finding that (1) her past involvement with G.G. was indicative of poor decision-making on her part, (2) there were indications of excessive alcohol and drug use on her part, and (3) she had demonstrated an inability to make sound decisions on behalf of the Children.  Father contends that the trial court carefully weighed all of the testimony and other evidence to find that a pattern of behavior exhibited by Mother since entry of the June 2008 parenting plan had affected the Children so as to constitute a material change in circumstance.  Upon our careful review, we agree with Father on this issue.

At the time of a divorce when at least one minor child is involved, as occurred in this case, the trial court must "make a custody determination" "on the basis of the best interest of the child."  *See* Tenn. Code Ann. 36-6-106(a) (Supp. 2013) (delineating factors the court shall consider when taking into account the child's best interest).  Because Father in his petition to modify the permanent parenting plan requested that he be named the primary residential parent rather than Mother, this action is considered one for modification of "custody."  *See Armbrister v. Armbrister*, 414 S.W.3d 685, 703 (Tenn. 2013) (comparing the standard for an action to modify custody to the standard for an action to modify only a residential parenting schedule).  Upon a petition to modify custody from one parent to the other parent, "the 'threshold issue' is whether a material change in circumstance has occurred after the initial custody determination."  *See Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002) (quoting *Blair v. Badenhope*, 77 S.W.3d 137, 150 (Tenn. 2002)).  Upon a trial court's finding that a material change in circumstance affecting the children has occurred, "it must then be determined whether the modification is in the child[ren]'s best interests."  *Kendrick*, 90 S.W.3d at 570 (citing Tenn. Code Ann. § 36-6-106); *see generally Boyer v. Heimermann*, 238 S.W.3d 249, 255 (Tenn. Ct. App. 2007) ("In approaching questions of custody and visitation, the needs of the children are paramount; the desires of the parents are secondary.").

Regarding the standard a petitioning parent must meet to prove a material change in circumstance sufficient for consideration of whether custody modification is in the best interest of the child, Tennessee Code Annotated § 36-6-101(a)(2)(B) (2014) provides in relevant part:

(B)     If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance.  A material change of

circumstance does not require a showing of substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.

(i)     In each contested case, the court shall make such a finding as to the reason and the facts that constitute the basis for the custody determination.

*See also Armbrister*, 414 S.W.3d at 703.

In finding that a material change in circumstance had occurred since entry of the June 2008 permanent parenting plan, the trial court in its final judgment stated the following in pertinent part:

The court finds from the preponderance of all the evidence in the case that [G.G.] was the victim of a domestic assault upon his person by Mother as he initially alleged in his arrest complaint.

The court finds that [G.G.'s] denials based upon loss of his memory are not credible and are the product of Mother's influence upon him after her arrest.

The physical evidence of the bite marks, abrasions and scratches upon his person are not denied by [G.G.] to have occurred. He has testified he was sore all over after the incident, so much so, that he sought emergency medical care the evening of July 23, 2012.

The court finds, as the court previously found, the testimony of Officer Julius Porter is believed over any conflicting account and over any denial testified to by Mother or by [G.G.].

Likewise the testimony of Deputy Sheriff David Harper is believed over any conflicting account and over any denial testified to by [G.G].

Mother admits that on July 23, 2012 she and [G.G.] argued over her seeing other men, that her 3-year-old son may have bitten [G.G.] in an effort to defend her during their argument, and that she mixed alcohol with her prescription drugs that day.

Mother admits that following her arrest she continued to see [G.G.] for the purpose of influencing his testimony and encouraging him to disavow the facts he alleged in his sworn arrest complaint.

Mother's denial of the facts alleged in the domestic assault charge are not believed. Mother changed her testimony while on the witness stand in the final hearing. At first she blamed Father for her arrest then she said she took personal responsibility. She first blamed Father for causing her arrest to be reported in the local newspaper claiming that she had received information from someone working at the newspaper. Then Mother admitted she knew of no such person and she received no such information from any employee of the newspaper.

Mother admitted that her complaint to the T.B.I. alleging that [O]fficer Porter had spoken with Father while she was being transported in the patrol car and asked if Father wanted her arrested was false and did not happen. Mother repeatedly has claimed Father is responsible for getting her fired but she has no proof of this and at trial said she felt like he was the reason the school board would not drop its termination case against her.

The court finds that Mother has failed to address her hurt/anger/damaged trust/fearfulness in her first marriage, issues stemming from the divorce, that caused her (though unintentionally according to Dr. Roy Smith) to raise false reports of sexual abuse against Father;[3] that since the divorce she has not dealt with the issues that the court ordered her to deal with through counseling; and that she has entered into a series of relationships with men that contribute to her inability or unwillingness to address those issues - something Dr. Smith warned her not to do.

At the same time Mother has continually combined alcohol consumption with her prescription medication with the resulting effect upon Mother and her children of causing her to sleep while the children are in her care as testified to by [J.S.M.]. Further corroboration of this fact comes from

---

[3]In the original complaint for divorce, Mother alleged that the parties' daughter, then two and one-half years old, had reported "inappropriate touching" by Father. The trial court temporarily terminated all unsupervised visitation with the daughter by Father pending an investigation and psychological evaluation. Upon the findings and recommendation of psychologist Dr. Roy Smith, the trial court concluded in its Memorandum Opinion incorporated into the Judgment of Divorce that the report of sexual abuse against Father was unfounded, although in accordance with Dr. Smith's findings, the court did not find Mother's allegation to have been intentionally false.

[G.G.]. [G.G.] admitted that he had called Eric Elliott complaining to him of similar conduct by Mother in June of 2012. [G.G.] told Mr. Elliott that Mother's conduct caused [G.G.] concern for the children.

. . .

As previously stated, the above findings by the court and the record as a whole support the court's entry of the Temporary Order of September 21, 2012. Mother was in need of the counseling, drug assessment and psychological evaluation the court ordered September 21, 2012 and she remains in need of these today[.] Although Mother has submitted reports by experts on other issues, the reports reveal that Mother's expert proof in this matter fails to follow through on the earlier orders of the court that were based upon court findings and court orders that accepted Dr. Roy Smith's recommendations. The expert reports Mother has offered are of little help to the court. The court cannot rely on assurances of Mother and her experts because the reports show Mother deprived the reporting experts of accurate history of Mother's conduct. For instance, Mother reported to her expert that she drank only two glasses of wine as often as once per month; whereas, the proof shows at least twice weekly use while [J.S.M.] observed her. But, most glaringly, Mother has failed to raise with her experts the matter of her hurt/anger/damaged trust/fearfulness in her first marriage and the findings and recommendations of Dr. Roy Smith.

The court find[s] that Mother's false allegations against Father continue because she has not dealt with her issues from her marriage to Father as the court ordered her to do in the final decree of divorce.

. . .

The above findings show a pattern of behavior by Mother which constitutes a material change of circumstance warranting consideration of a change of custody.

Mother's lack of grasp upon reality, her poor decision-making, her misuse of alcohol and prescription medication, and her lies against Father are not one time episodes. The court finds they are patterns of misbehavior.

Mother's conduct has affected the children in a meaningful way. The DVD of April 7, 2012 shows the [effect] that Mother's accusations against

Father have upon the children.[4]  The following conduct of Mother has also affected her children in a meaningful way:

1.  Mother has failed to follow the order of the court to address her hurt/anger/damaged trust/fearfulness in her first marriage issues which at time of divorce was instrumental in the false report of Father's improper touching his daughter.  Her hurt/anger/damaged trust/fearfulness in her first marriage issues probably contributed to Mother's April 2012 outburst (Exhibit 4) and has also contributed to Mother's false report to the T.B.I. (Exhibit 6).

2.  Mother has habitually mixed her prescription medications with alcohol.  She began a downward spiral in early 2012. [G.G.], an R.N., may have supplied her with other medications during this time (Spring 2012), at a time when peer observations of her behavior at the school where she worked eventually resulted in termination of her employment.  Mother remains unemployed but has appealed the school board's action to Chancery Court.

3.  Mother did not do all she could between July 23rd 2012 and September 14, 2012 to keep [G.G.] away from herself or her children because she had to be nice to him so he would not testify against her in the Domestic Assault case.  She testified she did not want him around, yet, she refused to obtain an order of protection against him because of the Domestic Violence charge he had against her.

4.  Mother has falsely accused father of responsibility for her arrest and her termination from employment as a school teacher.  Mother did not retract the false charges against Father she made to the T.B.I. until she did so on the witness stand August 6, 2013 over a year after she made them.

5.  It is an inescapable conclusion that Mother's poisonous attitude toward Father revealed by her habitual lies about him are

---

[4]This DVD, presented at trial, was recorded by Father with his cellular telephone at the door of Mother's residence and contained footage of Mother shouting repeatedly to the Children that Father "is lying" and is "a manipulator."

> emotionally damaging to the children as shown on Exhibit 4, the
> DVD of her rant against Father in front of the children.

We conclude that the evidence does not preponderate against the trial court's findings. Mother asserts that the trial court was offended by Mother's relationship with G.G. and improperly sought to "punish" Mother for the July 23, 2012 incident by determining that a material change in circumstance had occurred. *See Boyer*, 238 S.W.3d at 255 ("Custody or visitation should never be used to punish parents for their human frailties and past mis-steps or conversely as a reward for parents."). Contrary to Mother's assertion, the trial court specifically found that Mother had exhibited "patterns of misbehavior" that were "not one time episodes." *Cf. Beckham v. Beckham*, No. M2007-02863-COA-R3-CV, 2009 WL 690692 at *12 (Tenn. Ct. App. Mar. 13, 2009) (concluding that "an apparently isolated episode of poor judgment" regarding the children's safety on four-wheelers was "insufficient to establish a material change of circumstance.").

Mother's relationship with G.G. was indicative of these behavior patterns in that it led to what the court found to be a domestic assault in Mother's home and a lack of credibility on the witness stand as to both G.G. and Mother. Mother did not dispute that the relationship with G.G. was an unhealthy one, and yet she admitted to continuing the relationship at least for a short time. Upon our review of the record, we conclude that the trial court properly considered and discredited G.G.'s testimony. Indeed, the record clearly indicates that G.G.'s testimony was evasive, contradictory, and unhelpful to the court. As Mother notes, G.G. was eventually prosecuted for filing a false police report in regard to the July 23, 2012 incident. Mother's argument fails to recognize, however, that her decision to associate with G.G., to engage in volatile behavior with G.G. at her home with her three-year-old child present, and to continue an intimate relationship with G.G. for however short a time following the July 23, 2012 incident are, as the trial court found, indicative of a pattern of "poor decision-making" that ultimately affected her parenting of the Children.

As to the trial court's finding regarding Mother's "misuse of alcohol and prescription medication," Mother asserts that the trial court failed to properly consider the alcohol and drug assessment and negative hair follicle drug screen Mother presented at trial. In the alcohol and drug assessment report, dated August 28, 2012, the counselor/assessor concluded that the assessment results indicated "a low probability of [Mother's] having a substance dependence disorder." The counselor recommended, however, that "due to the nature of the medications she is being prescribed," Mother "avoid consuming alcohol because of possible negative interactions with her prescription medications." In addition, Mother presented one hair follicle drug screen, performed on a sample collected September 19, 2012, with negative results for the five major controlled drug classes screened.

-13-

Conversely, Mother acknowledged at trial that "in the past, she would drink a glass of wine at dinner and then take an Ambien later in the evening." J.S.M. testified that when he was with Mother in the spring of 2012, she mixed prescription drugs and alcohol on a "daily/weekly basis" and took medication in front of the Children. According to Mother's testimony, the July 23, 2012 incident with G.G. began with their trip to buy paint as well as "skinny wine" and "skinny margaritas" before returning to Mother's home. In making its determination regarding Mother's use of alcohol with prescription medication, the trial court found that it could not rely on Mother's alcohol and drug assessment because Mother had self-reported to the counselor a lower use of alcohol than the other evidence would indicate.

Moreover, the trial court further found that Mother had exhibited a pattern of behavior that demonstrated a "poisonous attitude" toward Father that had affected the Children. *See, e.g., Killion v. Sweat*, No. E1999-02634-COA-R3-CV, 2000 WL 1424809 at *3 (Tenn. Ct. App. Sept. 21, 2000) ("We find that a change of custody is also warranted by the disparaging remarks [about the father] made by Mother to the child . . . ."). Mother asserts that the trial court erred by relying on a finding made during the divorce proceeding that Mother had falsely accused Father of sexually abusing the parties' daughter. However, the trial court noted this finding only as part of what the court found had become a pattern of Mother's behavior toward Father. Father presented a TBI complaint form documenting Mother's telephone call to TBI on August 2, 2012, a few days after the July 23, 2012 incident, in which she alleged that Officer Porter had called Father en route to the jail with Mother to ask "if he wanted her charged." The complaint to TBI further alleged that Father "intervened" and "prevented" the district attorney from dropping the charge against Mother at that time. Testifying in the instant action, both Officer Porter and Father denied that any such interference on Father's part had taken place. Mother then admitted at trial that the allegations in her complaint to TBI were unfounded.

Mother had also characterized her employment termination from the school system to the local newspaper as orchestrated by Father. Father testified that following news coverage of Mother's employment termination, the parties' son asked him at one point if he were responsible for Mother's losing her job. Mother admitted that contrary to her prior assertion, no one on the newspaper staff had told her that Father or his counsel supplied the newspaper with the story of her arrest. Father also presented an audiovisual recording, taken with his cellular telephone at the door of Mother's residence, that contains footage of Mother shouting repeatedly to the Children that Father "is lying" and is "a manipulator." The parties' son can be heard on the recording saying, "No, he's not," while the parties' daughter stands in the doorway listening.

Upon our careful and thorough review of the record, we determine that the evidence does not preponderate against the trial court's finding that Mother's pattern of behavior since

-14-

entry of the June 2008 permanent parenting plan constituted a material change in circumstance affecting the Children.

## V. Best Interest of Children

Mother contends that the trial court erred by failing to consider all relevant factors when it determined that a custody modification was in the best interest of the Children. Father contends that the trial court, upon finding a material change in circumstance, properly applied the statutory factors to determine whether a modification would be in the best interest of the Children and what that modification should be. We conclude that the evidence does not preponderate against the trial court's finding that it was in the best interest of the Children to modify the permanent parenting plan so as to designate Father as the primary residential parent with sole decision-making authority.

Having found that a material change in circumstance had occurred, the trial court was then required to apply the statutory "best interest" factors enumerated in Tennessee Code Annotated § 36-6-106 to determine whether a change in custody was in the best interest of the Children. *See Kendrick*, 90 S.W.3d at 570; *Cranston v. Combs*, 106 S.W.3d 641, 644 (Tenn. Ct. App. 2003). The version of Tennessee Code Annotated §36-6-106(a) (Supp. 2013)[5] in effect at the time the instant action was filed provided in relevant part:

> (a)  In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child. In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in subdivisions (a)(1)-(10), the location of the residences of the parents, the child's need for stability and all other relevant factors. The court shall consider all relevant factors, including the following, where applicable:

[5]The General Assembly has amended Tennessee Code Annotated § 36-6-106(a) (2014), effective July 1, 2014, to enumerate fifteen factors for the trial court's consideration when making a custody determination. *See* 2014 Tenn. Pub. Acts Ch. 617 (S.B. 1488). According to the preamble of Public Acts Chapter 617, the legislature's intent in amending the statute was to alleviate inconsistency and confusion caused by "different factors pertaining to judicial review of custodial arrangements and the establishment of residential schedules for minor children" that "differ[ed] slightly in their specifics," particularly among subsections 36-6-106(a), 36-6-404(b), and 36-6-108. *See id.* Because the instant action was commenced on July 27, 2012, the version of the statute in effect at that time controls our review of the trial court's analysis.

(1)     The love, affection and emotional ties existing between the parents or caregivers and the child;

(2)     The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;

(3)     The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; . . .

(4)     The stability of the family unit of the parents or caregivers;

(5)     The mental and physical health of the parents or caregivers;

(6)     The home, school and community record of the child;

(7)(A)     The reasonable preference of the child, if twelve (12) years of age or older;

(B)     The court may hear the preference of a younger child on request. The preferences of older children should normally be given greater weight than those of younger children;

(8)     Evidence of physical or emotional abuse to the child, to the other parent or to any other person; . . .

(9)     The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and

(10)    Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child

and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order.

Similarly, for "[a]ny final decree or decree of modification in an action for absolute divorce, legal separation, annulment, or separate maintenance involving a minor child," Tennessee Code Annotated §36-6-404(a) (2014) provides that an appropriate parenting plan shall:

(1) Provide for the child's changing needs as the child grows and matures, in a way that minimizes the need for further modifications to the permanent parenting plan;

(2) Establish the authority and responsibilities of each parent with respect to the child, consistent with the criteria in this part;

(3) Minimize the child's exposure to harmful parental conflict;

(4) Provide for a process for dispute resolution, before court action, unless precluded or limited by § 36-6-406; . . .

(5) Allocate decision-making authority to one (1) or both parties regarding the child's education, health care, extracurricular activities, and religious upbringing. The parties may incorporate an agreement related to the care and growth of the child in these specified areas, or in other areas, into their plan, consistent with the criteria in this part. Regardless of the allocation of decision making in the parenting plan, the parties may agree that either parent may make emergency decisions affecting the health or safety of the child;

(6) Provide that each parent may make the day-to-day decisions regarding the care of the child while the child is residing with that parent;

-17-

(7) Provide that when mutual decision making is designated but cannot be achieved, the parties shall make a good-faith effort to resolve the issue through the appropriate dispute resolution process, subject to the exception set forth in subdivision (a)(4)(F);

(8) Require the obligor to report annually on a date certain to the obligee, and the department of human services or its contractor in Title IV-D cases, on a form provided by the court, the obligor's income as defined by the child support guidelines and related provisions contained in chapter 5 of this title; and

(9) Specify that if the driver license of a parent is currently expired, canceled, suspended or revoked or if the parent does not possess a valid driver license for any other reason, the parent shall make acceptable transportation arrangements as may be necessary to protect and ensure the health, safety and welfare of the child when such child is in the custody of such parent.

Regarding residential provisions for each child, the version of Tennessee Code Annotated § 36-4-404 (2010) applicable to the instant action[6] further provided:

(b) Any permanent parenting plan shall include a residential schedule as defined in § 36-6-402. The court shall make residential provisions for each child, consistent with the child's developmental level and the family's social and economic circumstances, which encourage each parent to maintain a loving, stable, and nurturing relationship with the child. The child's residential schedule shall be consistent with this part. If the limitations of § 36-6-406 are not dispositive of the child's residential schedule, the court shall consider the following factors:

(1) The parent's ability to instruct, inspire, and encourage the child to prepare for a life of service, and to compete successfully in the society that the child faces as an adult;

_____

[6]The General Assembly has also amended Tennessee Code Annotated § 36-6-404(b) (2014), effective July 1, 2014, in keeping with the companion amendment to Tennessee Code Annotated § 36-6-106(a) described in the previous note. *See* 2014 Tenn. Pub. Acts Ch. 617 (S.B. 1488). Tennessee Code Annotated § 36-4-404(b) now states, "If the limitations of § 36-6-406 are not dispositive of the child's residential schedule, the court shall consider the factors found in § 36-6-106(a)(1)-(15)," referring to the fifteen best interest factors now enumerated in § 36-6-106(a). *See id.* As previously noted, the version of the statute in effect at the time this action was commenced on July 27, 2012, controls our review of the trial court's analysis.

(2) The relative strength, nature, and stability of the child's relationship with each parent, including whether a parent has taken greater responsibility for performing parenting responsibilities relating to the daily needs of the child;

(3) The willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interests of the child;

(4) Willful refusal to attend a court-ordered parent education seminar may be considered by the court as evidence of that parent's lack of good faith in these proceedings;

(5) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(6) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(7) The love, affection, and emotional ties existing between each parent and the child;

(8) The emotional needs and developmental level of the child;

(9) The character and physical and emotional fitness of each parent as it relates to each parent's ability to parent or the welfare of the child;

(10) The child's interaction and interrelationships with siblings and with significant adults, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(11) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(12) Evidence of physical or emotional abuse to the child, to the other parent or to any other person;

(13) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(14) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(15) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(16) Any other factors deemed relevant by the court.

In considering the applicable statutory factors regarding the best interest of the Children, the trial court in its final judgment stated the following in pertinent part:

The record before the court shows Father is more capable of meeting "parental responsibilities" than Mother and the court so finds.

The court specifically finds that the following T.C.A. 36-6-106, children's best interest factors, support a change of custody to Father.

(4)     Instability of Mother and her family unit;

(5)     Mother's emotional ill health;

(8)     Mother's emotional abuse to the child and to the other parent;

(9)     The bad character and erratic behavior of [G.G.] who frequented Mother's home and who Mother allowed to interact with her children;

(10)    Father's greater potential for future performance of parenting responsibilities, including his willingness and ability to facilitate and encourage a close and continuing parent-child relationship between the children and Father and Mother consistent with the

-20-

best interests of the child; his greater ability to provide for the children's emotional care and stability; his greater ability to supervise the children so as to protect their emotional, intellectual, moral and spiritual development; his greater ability to provide encouragement and protection of the children's intellectual and moral development; his greater ability to assist the children in developing and maintaining appropriate interpersonal relationships; and his greater ability to exercise appropriate judgment in matters relating to the welfare of the children.

Mother argues specifically that the court failed to consider (1) the veracity of Father's allegations in his petition for modification, (2) Mother's alcohol and drug assessment and negative alcohol and drug screen, and (3) the therapeutic counseling in which Mother participated during the year prior to the final hearing. We disagree. The trial court issued a sixty-five-page final order summarizing the factual and procedural history of this action, the evidence presented at trial, and a detailed description of its analysis. The best interest analysis required the trial court to determine the "comparative fitness" of Father and Mother as custodial parents. *See, e.g., Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996) ("[A]lthough the evidence may not have shown that Ms. Gaskill was an unfit mother, it may, and in this case does, indicate she is comparatively less fit than Mr. Gaskill to have custody of the parties' daughter.").

As this Court has recently explained:

"Fitness for custodial responsibilities is largely a comparative matter. No human being is deemed perfect, hence no human can be deemed a perfectly fit custodian. Necessarily, therefore, the courts must determine which of two or more available custodians is more or less fit than others." *Bah* [*v. Bah*], 668 S.W.2d [663,] 665-66 [(Tenn. Ct. App. 1983)] (quoting *Edwards v. Edwards*, 501 S.W.2d 283, 290-91 (Tenn. Ct. App. 1973)). "There are literally thousands of things that must be taken into consideration" in making a comparative fitness determination. *Bah*, 668 S.W.2d at 666.

*In the Matter of T.R.Y.*, No. M2012-01343-COA-R3-JV, 2014 WL 586046 at *13 (Tenn. Ct. App. Feb. 12, 2014). In the instant action, the court's findings demonstrate that it conducted such a comparative fitness analysis, focusing *inter alia*, on the five factors it found relevant among the ten factors provided in Tennessee Code Annotated § 36-6-106(a).

As to Father's allegations regarding the incident involving Mother's arrest and relationship with G.G., the trial court was well aware that G.G. had recanted his statement made to police officers and that the criminal charge of aggravated domestic violence against Mother had been dismissed. The court in the portion of its final order denying Mother's motion to dismiss the complaint specifically discredited the testimony of Mother and G.G. regarding the July 23, 2012 incident, except as it corroborated Corporal Harper's and Officer Porter's testimonies. The court stated in pertinent part:

> In this case the court is dealing with two witnesses the court finds lied about important facts in the case. [G.G.] and Mother lied about Mother's domestic violence that occurred on July 23, 2012. Mother willingly used her corporeal assets to procure from [G.G.] trial testimony that differed from his earlier sworn affidavit. Mother has also admitted she lied in her complaint against Father to the T.B.I.
>
> . . .
>
> The court has closely scrutinized the testimony of [G.G.] and Mother and finds that although they willfully lied about some important facts, each of them gave testimony that corroborated the truthful witnesses' testimony in the case, in particular the testimony of the, on scene, law enforcement officers which the court fully credits.

We stress that the trial court's findings as to witness credibility are afforded great weight on appeal. *See Gaskill*, 936 S.W.2d at 633-34 ("Trial courts are normally in the best position to judge the credibility of the witnesses since they have seen and heard the witnesses testify. Thus, a trial court's determination of credibility is entitled to great weight in this court.") (internal citations omitted). The court's findings regarding Mother's overall credibility; relationship with G.G., including the abusive July 23, 2012 incident and Mother's decision to renew intimacy following that incident; and admittedly unfounded statements to TBI and the local newspaper all contributed to the court's findings that Mother was less stable in her family unit than Father (factor 4), emotionally in ill health as compared to Father (factor 5), emotionally abusive to the Children and Father (factor 8), willing to expose the Children to someone of "bad character" (factor 9), and showed lesser potential for future performance of parenting responsibilities (factor 10). *See* Tenn. Code Ann. § 36-6-106(a). Moreover, "[a] parent's honesty reflects on his or her fitness to be a good custodian." *Gaskill*, 936 S.W.2d at 634.

As explained previously, the trial court included Mother's presentation of her alcohol and drug assessment and negative hair follicle screen in its findings, but the court further

found that it could not rely on Mother's self-reporting of her substance use to assessors. Mother presented a psychological evaluation, completed on March 13, 2013, demonstrating compliance with the court's previous order that she undergo a psychological evaluation. The evaluator did not testify, however, and supporting testing materials were not admitted at trial. Mother testified at the final hearing that she had been seeing a therapeutic counselor for approximately a year and that it had helped her to "talk to someone." The trial court, however, found that Mother had not adequately addressed to her evaluators or in counseling the issues first identified by a psychologist evaluating the family at the time of the divorce, Dr. Roy Smith, regarding Mother's "hurt/anger/damaged trust/fearfulness in her first marriage."

When questioned at trial regarding why she had attempted to blame Father for the termination of her employment, Mother responded as follows:

> Anything that has happened this whole time is my fault. I totally take responsibility for everything that has happened. I'm not blaming [Father]; I'm not blaming anyone else. It's all my fault.

> Has it been a little bit harder on me because of [Father]? Probably, but it is all my fault. I take full responsibility for it. I have made huge mistakes. I have paid dearly.

> I have lost my job. I have lost my children, and it has been a nightmare. But it is all my fault, and I am not blaming [Father] and I am not blaming anyone else. It's my fault. I made a huge mistake, and I take full responsibility for it.

While Mother's alcohol and drug assessment, negative hair follicle screen, participation in counseling, and willingness to accept responsibility may well be positive indicators of her willingness to correct the pattern of behavior that led the trial court to find a material change in circumstance, we determine that the evidence does not preponderate against the trial court's finding that consideration of these factors demonstrated Mother to be comparatively less fit to parent than Father.

We note that the remaining best interest factors contained in Tennessee Code Annotated § 36-6-106(a) were either inapplicable or weighed equally in favor of both parents in this case. Specifically as to factor 6, Mother argues that because the Children excelled in academics, citizenship, and sports while in her care, she should be viewed as the more fit parent. As the trial court noted, however, the record demonstrates that the Children continued to excel while in Father's care also, and both parents commendably continued to

encourage such success on the Children's part. The record also leaves no question that both parents have maintained a loving bond with the Children (factor 1). *See* Tenn. Code Ann. § 36-6-106(a)(1). The parties' son was of an age at trial when the court may have considered his custody preference, but it is undisputed that the son expressed a desire not to testify (factor 7). It is also undisputed that both parents have provided necessities to the Children when the Children were in their care (factor 2). *See id.* at (2). As for continuity of care, Mother was the Children's primary caregiver until entry of the *ex parte* temporary order in July 2012. By the time of the final hearing in August 2013, the Children had been living primarily with Father, his wife, and Father's two stepchildren for over a year and would have had the continuity of their living situation interrupted again by a return to Mother's primary care. *See id.* at (2), (3).

Finally, in designating Father as the primary residential parent and as the parent with sole decision-making authority, the trial court in its final judgment found that several factors contained within Tennessee Code Annotated § 36-6-406(d) (2014) were applicable to limit Mother's co-parenting time and preclude her decision-making ability. *See Melvin v. Melvin*, 415 S.W.3d 847, 851 (Tenn. Ct. App. 2011) (affirming the trial court's application of the statutory limiting factors). Tennessee Code Annotated § 36-6-406(d) provides:

> (d) A parent's involvement or conduct may have an adverse effect on the child's best interest, and the court may preclude or limit any provisions of a parenting plan, if any of the following limiting factors are found to exist after a hearing:
>
>     (1) A parent's neglect or substantial nonperformance of parenting responsibilities;
>
>     (2) An emotional or physical impairment that interferes with the parent's performance of parenting responsibilities as defined in § 36-6-402;
>
>     (3) An impairment resulting from drug, alcohol, or other substance abuse that interferes with the performance of parenting responsibilities;
>
>     (4) The absence or substantial impairment of emotional ties between the parent and the child;
>
>     (5) The abusive use of conflict by the parent that creates the danger of damage to the child's psychological development;

(6) A parent has withheld from the other parent access to the child for a protracted period without good cause;

(7) A parent's criminal convictions as they relate to such parent's ability to parent or to the welfare of the child; or

(8) Such other factors or conduct as the court expressly finds adverse to the best interests of the child.

Specifically, the trial court stated the following in its final judgment regarding its application of Tennessee Code Annotated § 36-6-406(d) limiting factors:

The court finds that T.C.A. 36-6-406(d) factors in which the court may limit provisions of a parenting plan also apply. The court finds these factors are:

(2) Mother's emotional impairment that causes her to make false allegations against Father also interferes with her ability to encourage the children's moral development and interferes with her ability to assist the children in developing and maintaining appropriate interpersonal relationships (See 36-6-402(2)(C) and (D);

(3) Mother's impairment from misuse of drugs and alcohol by using them together also interferes with her ability to "make decisions and perform duties necessary for the care and growth of the children." (See 36-6-402);

(5) Mother's pattern of engaging in the abusive use of parental conflict is such that she has created the danger of damage to the children's psychological development;

(8) Mother's failure to tell the truth, and, in this case, her false accusations against Father to the children and to his employer and the public print media have exposed the children to needless injury and harm to which children are most vulnerable. Mother has not hesitated to put her children in [harm's] way of her accusations against Father in these instances and as shown on Exhibit 4.

Upon our careful and thorough review of the record, we determine that the trial court carefully considered the applicable statutory factors to place the children "'in an environment that will best serve [their] physical and emotional needs.'" *See In the Matter of T.R.Y.*, 2014 WL 586046 at *16 (quoting *In re T.C.D.*, 261 S.W.3d 734, 742-43 (Tenn. Ct. App. 2007)). We affirm the trial court's designation of Father as the primary residential parent with sole decision-making authority. We have also reviewed the permanent parenting plan order entered by the trial court, detailing Mother's residential co-parenting time, and we affirm it in all respects.

## VI. Conclusion

For the reasons stated above, we affirm the judgment of the trial court. This case is remanded to the trial court for enforcement of the judgment and collection of costs below. Costs on appeal are taxed to the appellant, Susan Ellen Calfee Muhonen.

_____
THOMAS R. FRIERSON, II, JUDGE